20 SC 1196 NEB/BRT

RECEIVED
MAY 18 2020
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **OMNI HEALTHCARE, INC.,** | ) | |
| **Plaintiffs,** | ) | **FILED IN CAMERA AND UNDER SEAL** |
| **v.** | ) | **DO NOT PLACE ON PACER** |
| **McKESSON CORPORATION, McKESSON MEDICAL-SURGICAL, INC. and PREMIER BIOTECH, INC.** | ) | |
| **Defendants.** | ) | |

---

## *QUI TAM* COMPLAINT

---

Relator Omni Healthcare, Inc. ("Omni" or "Relator"), on behalf of the United States, brings this action against McKesson Corporation, McKesson Medical-Surgical, Inc. (collectively "McKesson") and Premier Biotech, Inc. ("Premier") (collectively "Defendants"), for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

## INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States arising from false and/or fraudulent statements and claims made by Defendants. The allegations involve inaccurate and ineffective COVID-19 tests sold by Defendants, for which the United States was charged.

2. As explained in more detail herein, Defendant McKesson, one of the largest healthcare companies in the world, promised its customers that it would only sell COVID-19

SCANNED
MAY 18 2020
U.S. DISTRICT COURT MPLS

antibody tests issued as Emergency Use Authorization ("EUA") by the Food and Drug Administration ("FDA"). However, McKesson continued to offer a Chinese non-EUA version, supplied by Defendant Premier, which has questionable accuracy at best.

3. McKesson concluded in April 2020 that the accuracy and quality of the non-EUA tests varied greatly. The company stated the "best approach to supporting better patient care . . . is to rely on tests issued as an EUA by the regulators." However, the company's self-styled "best approach" for patient care did not stop it from continuing to offer the non-EUA antibody test, which it has been selling since March.

4. Rapid antibody tests are in high demand, with at least 188 manufacturers marketing different versions. As of May 15, 2020, 13 companies had received emergency authorization from the FDA. Defendant McKesson's decision to continue selling a non-EUA test came as the American reseller, Defendant Premier, received 500,000 additional kits from the Chinese company Hangzhou Biotest Biotech Co. Ltd. ("Hangzhou")—worth at least $9 million. Defendants Premier and McKesson exploited the COVID-19 pandemic by continuing to sell these test kits even with the knowledge that they were not accurate, at the expense of the United States and American taxpayers.

5. An independent test conducted by Relator found the tests supplied by Defendant Premier and distributed by Defendant McKesson failed to find evidence of antibodies each time they were used to evaluate patients who tested positive for COVID-19. Premier tests used in Jacksonville and Houston have also produced questionable results, including false negatives. A large-scale study by a Stanford University professor of medicine found high rates of false negatives with the test.

6. The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of $10,781 to $21,563 for each such claim, as well as three times the amount of the damages sustained by the Government. The FCA permits persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint remains under seal while the Government conducts an investigation of the Complaint's allegations and determines whether to join the action.

7. Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and civil penalties arising from Defendants purposefully causing the submission of false and/or fraudulent claims to the Government.

**PARTIES**

8. The United States is a real party of interest in this action.

9. Relator Omni Healthcare, Inc. is a professional medical company based primarily in Brevard County, Florida. Relator operates in central Florida and specializes in the field of internal medicine with a subspecialty in hematology and oncology. Relator, through its principals, regularly treats patients on both an inpatient and outpatient basis, and regularly purchases drugs and orders tests from various distributors and laboratories in order to treat its patients.

10. Relator is the original source of the facts and information set forth concerning the activities of Defendants. The facts alleged within are based on the personal observations of Relator Omni's principal, as well as documents and information in his possession. The information and observations led Relator to question Defendants' fraudulent actions.

11. Defendant McKesson Corporation is a Delaware corporation headquartered in Texas. It is currently 6th on the Fortune 500 list and is one of the largest distributors of healthcare products in the world.

12. Defendant McKesson Medical-Surgical, Inc., a Virginia corporation, is a subsidiary of Defendant McKesson Corporation. The medical-surgical solutions business has more than 200,000 customers, including physician's offices and hospital reference laboratories, and offers more than 150,000 products to healthcare providers.

13. Defendant Premier, a Minnesota corporation, provides rapid drug testing diagnostic devices. Its affiliated laboratory provides customized services for customers in criminal justice and corrections, health and human services, and employer drug monitoring programs. The Minneapolis company is current reselling antibody screening tests from Chinese manufacturer Hangzhou Biotest Biotech Co. Ltd.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. 3732.

15. This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants have transacted business in The District of Minnesota.

16. Venue is proper in this District pursuant to 31 U.S.C. 3732(a) because Defendants can be found in, reside in and/or have transacted business in the District of Minnesota.

17. Relator knows of no other FCA complaints that have been filed against Defendants alleging the same or similar actions. Additionally, Relator is an original source as defined in 31 U.S.C. § 3730(e)(4)(B). Relator made voluntary disclosures to the United States prior to the filing of this lawsuit.

## REGULATORY OVERVIEW

### <u>The Federal False Claims Act</u>

18. The False Claims Act, 31 U.S.C. §§ 3729 *et seq.* reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). The FCA establishes liability for an individual or entity that:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

31 U.S.C. § 3729(a)(1).

19. The FCA defines "knowing" and "knowingly" to mean that a person with respect to information (1) has action knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required and an innocent mistake is not a defense to an action under this act. *Id.*

20. In addition to treble damages, the FCA provides for the assessment of civil penalties for each violation.

### <u>Government Healthcare</u>

### The Medicare Program

21. In 1965, Congress enacted Title XVIII of the Social Security Act ("SSA"), known as the Medicare program, to pay for healthcare services provided to certain segments of the population. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395 *et seq.*

22. The Department of Health and Human Services ("HHS"), through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare program. Individuals or entities who are Medicare providers may seek reimbursement from CMS for services rendered to Medicare beneficiaries.

**The Food and Drug Administration Emergency Use Authorization**

23. The Food and Drug Administration ("FDA") is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, the nation's food supply, cosmetics, and products that emit radiation. 21 U.S.C. § 301 *et seq*.

24. COVID-19 antibody tests originally required only that companies attest their product was valid and labeled as unapproved. However, under its new policy, the FDA requires test makers to submit requests for Emergency Use Authorization ("EUA") of their tests within ten days from when the test is validated. Companies with tests currently on the market must submit an application for EUA.

25. EUA authority allows the FDA to help strengthen the nation's public health protections by facilitating the availability and use of Medical Countermeasures ("MCMs") needed during public health emergencies.

## ALLEGATIONS

**Overview**

26. Blood tests for antibodies are used to determine people who had previously been infected with the COVID-19 virus. The virus can easily be spread by people with no symptoms, so widespread antibody testing has been regarded as a critical piece in the effort to get

Americans back to work safely, as the presence of antibodies to the virus may indicate possible immunity to future infection.

27. One of the largest healthcare companies in the world, Defendant McKesson, promised its customers it would only sell COVID-19 antibody tests issued an EUA by the FDA. However, they knowingly continued to offer a Chinese non-EUA version with questionable accuracy.

28. Defendant McKesson concluded in an April 28, 2020 letter to its customers that the accuracy and quality of non-EUA tests vary greatly. The company said the "best approach to supporting better patient care at this time . . . is to rely on tests issued as EUA by the regulators." Its letter is one in a series of customer updates in which McKesson discusses the critical role the healthcare distributor plays in fighting the pandemic.

29. The company's self-styled "best approach" for patient care did not stop them from continuing to offer a non-EUA Chinese rapid antibody test, which it has been selling since March. The test, which is manufactured by Hangzhou and supplied by Defendant Premier, an American reseller, has not been issued an EUA.

30. An independent examination by Relator Omni found the tests from Hangzhou failed to find evidence of antibodies each time it was used to evaluate patients who tested positive for COVID-19.

31. Rapid antibody tests are in high demand, with at least 188 manufacturers marketing a version. As of May 15, thirteen companies had received EUA authorization from the FDA. Defendant McKesson's decision to continue selling a non-EUA test came as Defendant Premier received 500,000 additional kits—worth at least $9 million.

**False Claims for Faulty Testing**

32. Beleaguered by the scale and speed of the COVID-19 pandemic, the FDA instituted a policy of "regulatory flexibility" in March 2020 in order to provide front line healthcare workers with access to cutting-edge serological tests that could potentially play a critical role in helping Americans return to work and resume normal activities.

33. The tests measure antibodies to determine who has been infected, who may be protected from future infection, and who may still be at risk. According to the FDA, the results of the testing can help doctors determine who may be able to qualify to donate blood that can be used to manufacture convalescent plasma—an "investigational" blood product being used to treat seriously ill victims of the virus.

34. The FDA's effort is designed to make "accurate and reliable serology tests widely available, while also protecting Americans from tests marketed with false or unsubstantiated claims." Additionally, the FDA states it is "especially important" in a public health emergency that tests are validated because false results could have a "broad public health impact."

35. Rather than independently evaluate, the FDA said it would accept the manufacturer's own reports as validation, provided the FDA was put on notice. It added that test results must include "information along the lines of the following:"

- The test has not been reviewed by the FDA;
- Negative results do not rule out SARS-CoV-2 infection, particularly in those who have been in contact with the virus; follow-up testing with a molecular diagnostic should be considered to rule out infection in these individuals;
- Results from antibody testing should not be used as the sole basis to diagnose or exclude SARS-CoV-2 infection or to inform infection status; and,

- Positive results may be due to past or present infection with non-SARS-CoV-2 coronavirus strains, such as coronavirus HKU1, NL63, OC43 or 229E

36. The FDA lists 198 manufacturers and 16 laboratories which have notified the agency that they have validated and are able to offer serology tests.

37. The test offered by Defendant McKesson comes from Defendant Premier, an American reseller for Chinese test manufacturer Hangzhou. The FDA states that Hangzhou notified the agency that it validated its own test. It is not FDA-authorized, meaning the agency has not reviewed the manufacturer's test certification or issued an EUA. The Hangzhou test has been used by at least two states, along with Stanford University and Major League Baseball, which purchased at least 15,000 kits from Defendant Premier.

38. Jay Bhattacharya, a professor of medicine at Stanford, conducted a large-scale study using approximately 10,000 employees from 27 of MLB's 30 teams. The study relied upon the rapid test kits made by Hangzhou, sold by Premier and distributed by McKesson.

39. The rapid test kit provided by Defendant Premier relies on blood from a finger stick. Approximately 10 microliters of blood is placed into the test cassette, and two drops of a buffering agent is added. In 10 minutes, the cassette displays the results. His findings, which have yet to be published, found the test kits produced false negatives 15 percent of the time. These results are approximately five times higher than the study conducted by Hangzhou. They also generated false positives at a rate of 0.5 percent. The results so concerned Bhattacharya that he provided 200 test kits to the FDA for validation. Though he submitted the tests for validation, the agency has yet to respond to him or to publicly discuss the validity of the Hangzhou tests.

40. Defendant McKesson—a healthcare superstore with $214 billion in revenue in 2019—offered the Chinese test roughly a week after the FDA relaxed its regulatory standards.

The sales package contains an insert explaining the test and an evaluation of the diagnostic value of the kit from the Jiangsu Provincial Center for Disease Control and Prevention in China. It shows a 96.4% coincident rate based on testing 250 patients.

41. A March 2020 letter from Defendant McKesson makes no reference to the test results. Instead, it encourages its customers to read through the FDA policy to make the most informed decision regarding how their medical practices and healthcare facilities might best use the test. It closes by sharing a link to the FDA website listing manufacturers that intend to make and distribute serology tests—which includes Hangzhou. Finally, the customer letter adds: "Thank you for your partnership. Thank you for your trust and patience. And thank you for taking care of our communities during the best of times and the hardest times."

42. On March 30, 2020, Defendant McKesson updated its customers on COVID-19 with a website post from CEO Brian Tyler. The company stated: "Yesterday, our CEO Brian Tyler had the opportunity to underscore to President Trump, Vice President Pence and other administration officials the critical role McKesson plays in the medical supply chain and outline all the ways in which we are doing our part in the fight against the COVID-19 pandemic."

43. As one of the world's largest healthcare companies, McKesson explained it has a "critical role to play" in making medications and supplies available to customers and patients. The company stated that it is "something we take seriously every day and even more so right now as the world faces this healthcare challenge."

44. Beijing encouraged Chinese companies to export test kits and other supplies. Some Chinese kit-makers took advantage of lax European Union regulations in order to get their products into foreign markets before they had approval in China. On March 31, 2020, Chinese health officials tightened the export of COVID-19 tests after complaints from its European

customers questioning the reliability of rapid tests purchased from China. Hangzhou's shipments were suspended.

45. Two weeks later, in April 2020, NBC News reported that unapproved Chinese coronavirus antibody tests were being used in at least two states, including those that were manufactured by Hangzhou, resold by Defendant Premier, and distributed by Defendant McKesson. Defendant Premier pushed back through its lawyer, who stressed that the tests were lawfully exported from China and are "lawfully on the U.S. market under FDA's COVID-19 policy." The company's lawyer also said the "diagnostic has been validated by testing as per FDA's policy."

46. Even after all of the exposure, Defendant McKesson continued selling the Chinese test kits. Its website noted 97 customers "recently used" the Premier kits, but did not state how many had been sold. It did not comment on the NBC News story, and made no public effort to independently validate the accuracy of the test; it merely instructed customers to log-in and check the availability of the test.

47. Relator Omni provided molecular tests to more than 10,000 residents of the Brevard County area, including front-line healthcare workers and first responders. In mid-April, it purchased antibody tests from multiple manufacturers and began a rigorous independent validation program to ensure accuracy. Relator's principal believes independent validation of testing to be critical, particularly with tests designed to determine who has and who has not been infected with COVID-19. Results from these tests could potentially be used to determine who is healthy enough to return to work and which virus survivors can provide blood plasma to severely ill patients. If the tests are unreliable, they can produce false results, either negative or positive, which can have a huge impact on the American public.

48. Defendant Premier's test, which was sold by Defendant McKesson and others, failed each time it was used to find antibodies reflecting COVID-19 infection in 10 individuals who tested positive for the virus. Relator immediately informed the FDA.

49. Tim Stenzel, the director of the Office of InVitro Diagnostics and Radiological Health in the Office of Product Evaluation and Quality of the FDA, could not explain the discrepancies in the tests. In an April 30, 2020 email, Stenzel wrote that the FDA was aware but he could not explain the "stark contrast in results."

50. In its latest guidance, which was published on May 4, 2020, the FDA stated that it will communicate questions or concerns about poor performance or misleading statements to the manufacturer. If the concerns cannot be or have not been addressed in a timely manner, the agency "would expect the manufacturer to suspend distribution of the test."

51. As demand for antibody tests of all types skyrocketed, Defendant McKesson used its company webpages to educate its customers about testing methods and describe its approach to rapid antibody serology testing:

> As it relates to rapid antibody serology testing, our approach at this time will be to offer only antibody serology tests receiving an EUA [Emergency Use Authorization]. This is important because serology tests on the market that have not received a EUA (as in the Policy for Diagnostic Tests for Coronavirus Disease-2019) have not been reviewed or authorized by the FDA. We believe that reliance on the FDA's EUA process is the best approach to supporting better patient care at this time.

52. Hangzhou notified the FDA that it would be offering its serology tests for sale in the United States in March 2020. On March 25, the FDA listed the Chinese company among some 25 manufacturers that said they would be selling serology tests. It added "[t]he FDA has not reviewed the validations of tests offered by these developers, who will not be pursuing

EUAs, and is including the list here to provide transparency regarding the notifications submitted to the FDA."

53. Three weeks later, on April 15, the FDA listed kit manufacturers that may or may not seek an EUA. The number of sellers had tripled. By May 18, 198 manufacturers were offering tests. The FDA explained: "[i]f an EUA request is not submitted within a reasonable period of time, or if significant problems are identified with a test and cannot be or have not been addressed in a timely manner, the FDA intends to remove the manufacturer and test from this list, would expect the manufacturer to suspend distribution of the test, and may take additional actions as appropriate."

54. Though Hangzhou has offered its test for approximately six weeks, the FDA does not list Hangzhou as having received an EUA. As of May 18, 2020, Defendant McKesson still lists Defendant Premier's test kit for sale on its shopping pages.

55. High demand for the rapid antibody test kits—coupled with China's stringent policy on pre-approving COVID-19 exports—created a shortage. In an April 23, 2020 email, a Premier customer service representative stated that the company was out of stock and "[their] supply had been disrupted."

56. The disruption ended on April 28, 2020 when the Chinese National Medical Products Administration relaxed its export policies, opening the market. Defendant Premier's Director of Clinical Development stated that she expected the company to receive 500,000 test kits on May 1.

## <u>COUNT I</u>

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729 et seq.

57. Relator incorporates paragraphs 1 through 56 of this Complaint as though fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

58. As described in greater detail above, Defendants abused the Medicare program by exploiting the current COVID-19 pandemic through the act of selling antibody tests which they knew or should have known were producing unreliable results and which were being paid for by a Government healthcare program. Through these actions, Defendants caused false claims to be submitted for payment to the Medicare program.

59. Under the FCA, Defendants have violated:

i. 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and

ii. 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

60. Because of the false claims Defendants caused to be submitted to the United States, the United States has suffered damages and possibly continues to suffer damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## PRAYER

WHEREFORE, Relator, on behalf of the United States, respectfully requests that:

a. This Court enter an order determining that Defendants violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

b. This Court enter an order requiring Defendants to pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

c. This Court enter an order requiring Defendants to cease and desist from violating the FCA;

d. This Court enter an order requiring Defendant to pay all expenses, attorney's fees and costs associated with this action;

e. This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

f. Any and all other relief as this Court determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Dated: May18, 2020.

Respectfully submitted,

/s/ Marlene J. Goldenberg
Marlene J. Goldenberg
MN Bar No. 0394943
GoldenbergLaw, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
mjgoldenberg@goldenberglaw.com
Tel.: (612) 333-4663
Fax: (612) 367-8106

**Local Counsel for Relator**

Jesse L. Hoyer
Florida Bar No.: 076934
jesse@hoyerlawgroup.com
Sean Estes
Florida Bar No.: 048320
sean@hoyerlawgroup.com
Hoyer Law Group, PLLC
2801 W. Busch Blvd., Suite 200
Tampa, Florida 33618
Tel.: (813) 375-3700
Fax: (813) 375-3710

**Lead Counsel for Relator**