RECEIVED
NOV 24 2020
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

UNITED STATES OF AMERICA,
STATE OF ALASKA,
STATE OF CALIFORNIA,
STATE OF COLORADO,
STATE OF CONNECTICUT,
STATE OF DELAWARE,
STATE OF FLORIDA,
STATE OF GEORGIA,
STATE OF HAWAII,
STATE OF ILLINOIS,
STATE OF INDIANA,
STATE OF LOUISIANA,
STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS,
STATE OF MICHIGAN,
STATE OF MINNESOTA,
STATE OF MONTANA,
STATE OF NEVADA,
STATE OF NEW HAMPSHIRE,
STATE OF NEW JERSEY,
STATE OF NEW MEXICO,
STATE OF NEW YORK,
STATE OF NORTH CAROLINA,
STATE OF OKLAHOMA,
STATE OF RHODE ISLAND,
STATE OF TENNESSEE,
STATE OF TEXAS,
COMMONWEALTH OF VIRGINIA,
STATE OF WISCONSIN, and
DISTRICT OF COLUMBIA, *ex rel.* OMNI HEALTHCARE, INC.,

Plaintiffs,

v.

McKESSON CORPORATION, McKESSON MEDICAL-SURGICAL, INC. and PREMIER BIOTECH, INC.

Defendants.

CASE NO.: 20-SC-1196 (NEB/BRT)

**COMPLAINT PURSUANT TO FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*, AND PENDENT STATE FALSE CLAIMS ACTS**

**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**

**NOT FOR PUBLIC DISCLOSURE**
**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER**

**JURY TRIAL DEMANDED**

SCANNED
NOV 24 2020
U.S. DISTRICT COURT MPLS

## AMENDED *QUI TAM* COMPLAINT

Relator Omni Healthcare, Inc. ("Omni" or "Relator"), on behalf of the United States, the State of Alaska, the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Louisiana, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New Hampshire, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Wisconsin and the District of Columbia (collectively "the States" or "the Plaintiff States"), brings this action for violations of the Federal False Claims Act, 31 U.S.C. §§3729 *et seq.* ("False Claims Act" or "FCA"), as well as for violations of the following state false claims acts: The Alaska Medical Assistance False Claims Reporting Act, AK Stat § 09.58.010 *et seq.*; The California False Claims Act, Cal. Gov't Code §§12650 *et seq.*; The Colorado Medicaid False Claims Act, 25.5-4-304-25.5-4-310; The Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; The District of Columbia False Claims Act, D.C. Code Ann. §§2-308.03 *et seq.*; The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§1201 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid Claims Act, Ga. Code Ann. §§49-4-168 *et seq.*; The Hawaii False Claims Act, Haw. Rev. Stat. §§661-21 *et seq.*; The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. Ann. §§175/1 *et seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5; The Louisiana Medical Assistance Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; The Maryland False Health Claims Act of 2010, Md. Code Ann. § 2-602 *et seq.*; The Massachusetts False

Claims Act, Mass. Ann. Laws. Ch. 12, §§5A *et seq.*; The Michigan Medicaid False Claims Act, MCLS §§400.601 *et seq.*; The Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; The Montana False Claims Act, Mont. Code Anno. §§17-8-401 *et seq.*; The Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; The New Hampshire False Claims Act, RSA tit. XII, Ch. 167: 61-b; The New Jersey False Claims Act, N.J. Stat. §2A:32C-1 *et seq.*; The New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §27-2F-4 *et seq.*; The New York False Claims Act, NY CLS St. Fin. §§187 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 *et seq.*; The Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 *et seq.*; The Rhode Island False Claims Act, R.I. Gen. Laws §§9-1.1-1 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 *et seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 *et seq.*, (collectively the "State False Claims Acts" or "State FCAs"), to recover all damages, civil penalties and all other recoveries provided for under the Federal False Claims Act and the State False Claims Acts. Relator also seeks to recover money on behalf of the United States and private insurance policyholders through the California Insurance Frauds Prevention Act, Ins. Code §§ 1871 *et seq.* and the Illinois Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.* for fraudulent submissions made to private insurance companies by Defendants in those states.

Relator Omni Healthcare, Inc. ("Omni" or "Relator"), on behalf of the United States, brings this action against McKesson Corporation, McKesson Medical-Surgical, Inc. (collectively "McKesson") and Premier Biotech, Inc. ("Premier") (collectively "Defendants"), for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

## INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States and the above-captioned Plaintiff States arising from false and/or fraudulent statements and claims made by Defendants. The allegations involve inaccurate and ineffective COVID-19 tests sold by Defendants, for which the United States was charged.

2. As explained in more detail herein, Defendant McKesson, one of the largest healthcare companies in the world, promised its customers that it would only sell COVID-19 antibody tests issued as Emergency Use Authorization ("EUA") by the Food and Drug Administration ("FDA"). However, McKesson continued to offer a Chinese non-EUA version, supplied by Defendant Premier, which has questionable accuracy at best.

3. McKesson concluded in April 2020 that the accuracy and quality of the non-EUA tests varied greatly. The company stated the "best approach to supporting better patient care . . . is to rely on tests issued as an EUA by the regulators." However, the company's self-styled "best approach" for patient care did not stop it from continuing to offer the non-EUA antibody test, which it has been selling since March.

4. Rapid antibody tests are in high demand, with at least 188 manufacturers marketing different versions. As of October 9, 2020, 52 companies had received emergency authorization from the FDA. Defendant McKesson's decision to continue selling a non-EUA test came as the American reseller, Defendant Premier, received 500,000 additional kits from the Chinese company Hangzhou Biotest Biotech Co. Ltd. ("Hangzhou")—worth at least $9 million. Defendants Premier and McKesson exploited the COVID-19 pandemic by continuing to sell these test kits even with the knowledge that they were not accurate, at the expense of the United States and American taxpayers.

5. An independent test conducted by Relator found the tests supplied by Defendant Premier and distributed by Defendant McKesson failed to find evidence of antibodies each time they were used to evaluate patients who tested positive for COVID-19. Premier tests used in Jacksonville and Houston have also produced questionable results, including false negatives. A large-scale study by a Stanford University professor of medicine found high rates of false negatives with the test.

6. The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of $10,781 to $21,563 for each such claim, as well as three times the amount of the damages sustained by the Government. The FCA permits persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint remains under seal while the Government conducts an investigation of the Complaint's allegations and determines whether to join the action.

7. Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and civil penalties arising from Defendants purposefully causing the submission of false and/or fraudulent claims to the Government.

## PARTIES

8. The United States is a real party of interest in this action.

9. Relator Omni Healthcare, Inc. is a professional medical company based in Brevard County, Florida. Relator employs and manages physician practices in multiple locations in central Florida specializing in family practice, internal medicine, surgery, pediatrics, OB/GYN, radiology and many subspecialties of medicine and surgery. Omni also operates a

high complexity CLIA approved laboratory. Relator, through its principals, regularly treats patients on both an outpatient basis and provides laboratory testing for its patients.

10. Relator is the original source of the facts and information set forth concerning the activities of Defendants. The facts alleged within are based on the personal observations of Relator Omni's principal, as well as documents and information in his possession. The information and observations led Relator to question Defendants' fraudulent actions.

11. Defendant McKesson Corporation is a Delaware corporation headquartered in Texas. It is currently sixth on the Fortune 500 list and is one of the largest distributors of healthcare products in the world.

12. Defendant McKesson Medical-Surgical, Inc., a Virginia corporation, is a subsidiary of Defendant McKesson Corporation. The medical-surgical solutions business has more than 200,000 customers, including physician's offices and hospital reference laboratories, and offers more than 150,000 products to healthcare providers.

13. Defendant Premier, a Minnesota corporation, provides rapid drug testing diagnostic devices. Its affiliated laboratory provides customized services for customers in criminal justice and corrections, health and human services, and employer drug monitoring programs. The Minneapolis company is currently reselling antibody screening tests from Chinese manufacturer Hangzhou Biotest Biotech Co. Ltd.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. 3732.

15. This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants have transacted business in The District of Minnesota.

16. Venue is proper in this District pursuant to 31 U.S.C. 3732(a) because Defendants can be found in, reside in and/or have transacted business in the District of Minnesota.

17. Relator knows of no other FCA complaints that have been filed against Defendants alleging the same or similar actions. Additionally, Relator is an original source as defined in 31 U.S.C. § 3730(e)(4)(B). Relator made voluntary disclosures to the United States prior to the filing of this lawsuit.

## REGULATORY OVERVIEW

### <u>The Federal and State False Claims Acts</u>

18. The False Claims Act 31 U.S.C. §§ 3729 *et seq.* reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). As relevant to this case, the FCA establishes liability for an individual or entity that:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,

31 U.S.C. § 3729(a)(1).

19. The FCA defines "knowing" and "knowingly" to mean that a person with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required and an innocent mistake is not a defense to an action under this act. *Id.*

20. In addition to treble damages, the FCA provides for the assessment of civil penalties for each violation.

21. The State False Claims Acts for the States captioned in this case mirror the language in the Federal FCA, and contain provisions similar to the ones quoted above.

**Government Healthcare**

22. In 1965, Congress enacted Title XVIII of the Social Security Act ("SSA"), known as the Medicare program, to pay for healthcare services provided to certain segments of the population. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395 *et seq.*

23. The Department of Health and Human Services ("HHS"), through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare program. Individuals or entities who are Medicare providers may seek reimbursement from CMS for services rendered to Medicare beneficiaries.

**The Food and Drug Administration Emergency Use Authorization**

24. The Food and Drug Administration ("FDA") is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, the nation's food supply, cosmetics, and products that emit radiation. 21 U.S.C. § 301 *et seq.*

25. COVID-19 antibody tests originally required only that companies attest their product was valid and labeled as unapproved. However, under its revised policy, the FDA requires test makers to submit requests for Emergency Use Authorization ("EUA") of their tests within ten days from when the test is validated. Companies with tests currently on the market must submit an application for EUA.

26. EUA authority allows the FDA to help strengthen the nation's public health protections by facilitating the availability and use of Medical Countermeasures ("MCMs") needed during public health emergencies.

## ALLEGATIONS

### Overview

27. Blood tests for antibodies are used to determine whether people had previously been infected with the COVID-19 virus and developed immunity. The virus can easily be spread by people with no symptoms, so widespread antibody testing has been regarded as a critical piece in the effort to get Americans back to work safely, as the presence of antibodies to the virus may indicate possible immunity to future infection.

28. One of the largest healthcare companies in the world, Defendant McKesson, promised its customers it only would sell COVID-19 antibody tests that provided the "best approach" to care, but continued to offer a Chinese version with questionable accuracy—a product its own staff called "snake oil,"—as demand for these types of devices skyrocketed. The test was manufactured by Hangzhou and distributed by Defendant Premier.

29. After months of providing the rapid-result, finger-stick test from Premier Biotech Inc., McKesson Corporation dropped the kits from its catalog, even though another version of the test finally had received an EUA from the FDA.

30. The FDA qualifies all of its approvals with a warning: The estimates shown may not be indicative of real-world test performance, such as tests that in the field rely on whole blood.

31. An independent examination by Relator Omni Healthcare Inc. found the tests, which are supplied by Premier and distributed by McKesson, among others, failed to find antibodies each time they were used to evaluate patients who tested positive for COVID-19.

32. A large-scale study by a Stanford University professor of medicine found high rates of false negatives with the tests. A comparison of antibody tests by the University of California-San Francisco raised other accuracy questions. Premier tests used in Jacksonville and Houston also produced questionable results, including false negatives.

33. On June 8, four days after Premier received its EUA, McKesson dropped the product and substituted another rapid-test kit.

34. Privately, a McKesson sales representative pushing Covid-19 antibody tests to doctors categorized the Premier product his company stopped selling as unreliable and nothing more than "snake oil."

35. Contrary to public statements extolling its efforts to support better patient care, Premier and McKesson acted with reckless disregard and continued to sell a test they knew or should have known was unreliable. They ignored the potential consequences on victims of the virus and the critical role such testing could play in helping Americans return to work and resume their normal activities.

36. Their actions allowed both companies to exploit the COVID-19 pandemic by continuing to sell these test kits, even with the knowledge that they were not accurate, all at the expense of taxpayers.

**False Claims for Faulty Testing**

37. The FDA is responsible for protecting the public health by assuring the safety, efficacy and security of human and veterinary drugs, biological products, medical devices, the nation's food supply, cosmetics and products that emit radiation. 21 U.S.C. § 301 *et seq.*

38. Beleaguered by the scale and speed of the COVID-19 pandemic, the FDA instituted a policy of "regulatory flexibility" in March 2020 in order to provide front line healthcare workers with access to cutting-edge serological tests.

39. COVID-19 antibody tests originally met FDA's relaxed standards if test makers attested their own evaluation of the product was valid and the product was labeled as unapproved. However, under its latest policy, the FDA requires test makers to submit requests for Emergency Use Authorization of their tests within 10 days of test validation. EUA authority is designed to allow the FDA to help strengthen the nation's public health protections by facilitating the availability and use of Medical Countermeasures ("MCMs") needed during public health emergencies.

40. Blood tests for antibodies are used to determine people who have been infected with the virus and who have developed antibodies against the virus. COVID-19 can easily be spread by people with no symptoms, so widespread antibody testing has been regarded as a critical piece in the effort to get Americans back to work safely. These tests measure antibodies to determine who has been infected, who may be protected from future infection, and who may still be at risk. According to the FDA, the results of the testing can help doctors determine who may be able to qualify to donate blood that can be used to manufacture convalescent plasma—an "investigational" blood product being used to treat seriously ill victims of the virus.

41. Though the FDA granted the Chinese test manufactured by Hangzhou Biotest Biotech Co. Ltd an EUA, it warned its estimates may not be indicative of real-world performance in either sensitivity or specificity.

42. The government warning accompanies every EUA granted, in part, because of the way the evaluations were conducted. Rapid tests, like those made by Hangzhou and offered by Premier, rely on whole blood. The Frederick National Laboratory for Cancer Research based its examination on serum and plasma samples. Its report adds under "Important caveats:"

> "These results are based on serum and plasma samples only and may not be indicative of performance with other sample types, such as whole blood, including finger stick blood. … the samples used may not be representative of the antibody profile observed in patient populations."

43. Still, the estimated likelihood of the Hangzhou test results correctly identifying individuals who had been infected with COVID-19 was 50.4%.

44. The FDA's effort is designed to make "accurate and reliable serology tests widely available, while also protecting Americans from tests marketed with false or unsubstantiated claims," said FDA Commissioner Stephen M. Hahn, MD.

45. Additionally, the FDA states it is "especially important" in a public health emergency that tests are validated because false results could have a "broad public health impact." If the tests are unreliable, they can produce false results, either negative or positive, which can have a huge impact on the American public.

46. McKesson – a healthcare superstore with $214 billion in revenue in 2019 – offered the Chinese test manufactured by Hangzhou Biotest Biotech Co. Ltd shortly after the FDA relaxed its regulatory standards. The sales package contains an insert explaining the test and evaluation of the diagnostic value of the kit from the Jiangsu Provincial Center for Disease Control and Prevention in China. It shows a 96.4% coincident rate based on testing 250 patients.

47. In March, as demand escalated, McKesson urged its customers to review the latest FDA policy "to make the most informed decision about how your practice or facility might use these tests." At the time, the FDA websites listed two dozen manufacturers that intended to make and distribute serology tests, including Hangzhou, the Chinese manufacturer of the test resold in America by Premier and marketed through McKesson.

48. The March 2020 customer letter from McKesson makes no reference to the test results. Instead, it encourages customers to read through the FDA policy to make the most informed decision about how their medical practices and healthcare facilities might best use the test.

49. It closes with a thank you to its customers: "Thank you for your partnership. Thank you for your trust and patience. And thank you for taking care of our communities during the best of times and the hardest of times."

50. On March 30, 2020, Defendant McKesson updated its customers on COVID-19 with a website post from CEO Brian Tyler. The company stated: "Yesterday, our CEO Brian Tyler had the opportunity to underscore to President Trump, Vice President Pence and other administration officials the critical role McKesson plays in the medical supply chain and outline all the ways in which we are doing our part in the fight against the COVID-19 pandemic."

51. As one of the world's largest healthcare companies, McKesson explained it has a "critical role to play" in making medications and supplies available to customers and patients. The company stated that it is "something we take seriously every day and even more so right now as the world faces this healthcare challenge."

52. A day later, on March 31, 2020, Chinese health officials tightened the export of COVID-19 tests after complaints from its European customers questioning the reliability of rapid

tests purchased from China. Beijing had encouraged Chinese companies to export test kits and other supplies. Some Chinese kit-makers took advantage of lax European Union regulations in order to get their products into foreign markets before they had approval in China. Hangzhou's shipments were suspended.

53. Three days later, McKesson reported in a letter to customers that it was making available its first antibody test. It explained the Premier BioTech test detects antibodies for SARS-COV-2 within 10 minutes with a sensitivity and specificity for each antibody above 91 percent, an accuracy rate so low that it did not meet current FDA standards.

54. By mid-April 2020, NBC News reported that unapproved Chinese coronavirus antibody tests were being used in at least two states, including those that were manufactured by Hangzhou, resold by Defendant Premier, and distributed by Defendant McKesson. Defendant Premier pushed back through its lawyer, who stressed that the tests were lawfully exported from China and are "lawfully on the U.S. market under FDA's COVID-19 policy." The company's lawyer also said the "diagnostic has been validated by testing as per FDA's policy."

55. Defendant McKesson continued selling the Chinese test kits. Its website noted 97 customers "recently used" the Premier kits, but did not state how many had been sold. It did not comment on the NBC News story, and made no public effort to independently validate the accuracy of the test; it merely instructed customers to log-in and check availability. Relator Omni provided molecular tests to more than 10,000 residents of the Brevard County area, including front-line healthcare workers and first responders. In mid-April, it purchased antibody tests from multiple manufacturers and began a rigorous independent validation program to ensure accuracy. Relator's principal believes independent validation of testing to be critical,

particularly with tests designed to determine who has and who has not been infected with COVID-19.

56. Defendant Premier's test, which was sold by Defendant McKesson and others, failed each time it was used to find antibodies reflecting COVID-19 infection in six individuals who tested positive for the virus. Relator immediately informed the FDA.

57. Tim Stenzel, the director of the Office of InVitro Diagnostics and Radiological Health in the Office of Product Evaluation and Quality of the FDA, could not explain the discrepancies in the tests

58. A large-scale study using approximately 10,000 employees from 27 of Major League Baseball's 30 teams also raised questions about accuracy. The study relied upon 15,000 rapid test kits made by Hangzhou provided by Premier. It was conducted by Dr. Jay Bhattacharya, a professor of medicine at Stanford University. The findings have not yet been published. These tests were conducted using a kit provided by Premier, which relied on blood from a finger stick. Approximately 10 microliters of blood are placed into the test cassette and two drops of a buffering agent are added. In 10 minutes, the cassette displays the results.

59. Bhattacharya found the test kits produced false negatives 15 percent of the time and false positives 0.5 percent of the time. These results are approximately five times higher than the study conducted by Hangzhou. The results so concerned Bhattacharya that he provided 200 test kits to the FDA for validation. The FDA has yet to respond to him.

60. The package insert accompanying the Hangzhou test claims substantially more accuracy. The insert says the test has an accuracy rate of 97.8 percent for IgM antibodies – the first formed – and 99.6 for IgM antibodies, which form within seven to 10 days and remain in the blood. Independent researchers obtained different results.

61. A comparison of a dozen serology tests conducted by researchers at the University of California campuses at San Francisco and Berkley concluded accuracy increased based on when the COVID-19 symptoms began.

62. These serology tests measure antibodies or immunoglobulins created by the immune system to fight the virus. The immune system generates two immunoglobulins – IgM and IgG. IgM usually is the first antibody produced to fight a virus. It may show up when a patient is first infected. The IgG antibody appears seven to 10 days after symptoms. Generally, it remains in an infected patient's system. In the case of Premier's finger-stick test, the study found the test identified antibodies – either IgM or IgG -- in just 37 percent of the patients who had been infected for between one and five days. At between six and 10 days, it found antibodies in 71 percent of the patients. At two weeks, the Chinese test rate increased to 83 percent. It detected antibodies 91 percent of the time only after patients had been infected for three weeks or more.

63. Stanford's review of the test found very few false positives, but a false negative rate that left "something to be desired," according to one of the Stanford researchers. The discrepancies are more easily accounted for when doing population surveillance rather than determining an individual's status, researcher Eran Bendavid told the Wall Street Journal.

64. Doctors who used these tests on patients previously diagnosed with COVID-19 in Jacksonville and Houston reported questionable results, including false negatives.

65. In contrast, evaluators at the Frederick National Laboratory for Cancer Research found no false negatives whatsoever, ranking the Premier test as 100 percent accurate. It reported the negative predictive value – the probability that individuals with negative test results are truly antibody negative – at 99.8 percent.

66. The lab estimated the positive predictive value – the probability that individuals with positive test results have COVID-19 antibodies – at a little more than half.

67. Its evaluation notes an important caveat: "These results are based on serum and plasma samples only and may not be indicative of performance with other sample types, such as whole blood, including finger stick blood." In real-world use, the Hangzhou test relies on whole blood.

68. Jeff Shuren, the director of the FDA's Center for Devices and Radiological Health, said in a written statement the agency is continuing to monitor authorized tests and is able to make changes when appropriate – including taking action when a test's benefits no longer outweigh its risks.

69. On June 16, 2020, the FDA announced it revoked the emergency use of authorization for one of the first antibody tests it authorized due to performance concerns with its accuracy. Data submitted by the company, Chembio Diagnostics, and an independent evaluation showed the test generates a higher than expected rate of false results and higher than that reflected in the authorized labeling. As of June 25, FDA had removed from distribution 50 serology tests offered by commercial manufacturers.

70. Congress questioned the FDA's antibody testing program. Rep. Carolyn B. Maloney, chairwoman of the House Committee on Oversight and Reform, called the testing policy a colossal failure that allowed numerous unregulated, inaccurate and fraudulent tests to be marketed and sold to American consumers.

71. McKesson's routine COVID-19 updates to its customers made no mention of Congressional hearings, the studies conducted at Stanford, the University of California or questions about the Premier serology test it continued to sell. On April 24, as demand for

antibody tests of all types skyrocketed, McKesson used its company webpages to "educate" its customers about testing methods and to describe its approach to rapid antibody serology testing:

> "As it relates to rapid antibody serology testing, our approach at this time will be to offer only antibody serology tests receiving an EUA [Emergency Use Authorization]. This is important because serology tests on the market that have not received a EUA (as in the Policy for Diagnostic Tests for Coronavirus Disease-2019) have not been reviewed or authorized by the FDA. We believe that reliance on the FDA's EUA process is the best approach to supporting better patient care at this time."

It repeated its position in an April 28 letter to its customers.

72. At the time, Hangzhou had been offering its test for about four weeks, but it still had not received an EUA. McKesson continued to market the Chinese company's rapid, finger-stick antibody test, even though it did not have an EUA.

73. High demand for rapid antibody test kits – coupled with China's stringent policy on pre-approving COVID-19 exports – created a shortage. A Premier customer service representative stated in an April 23 email that the company was out of stock and "[its] supply had had been disrupted."

74. The disruption ended on April 28, 2020 when the Chinese National Medical Products Administration relaxed its export policies, opening the market. Defendant Premier's Director of Clinical Development stated that she expected the company to receive 500,000 test kits on May 1. The McKesson catalog continued to feature the Premier test, though it had not received an EUA. A month later – on June 4 – the FDA issued Hangzhou an EUA.

75. On June 8 – four days after the EUA was issued – McKesson told its customers:

> "Serology antibody tests detect the IgM and IgG antibodies that indicate your patient has developed an immune response to the virus but does not provide definitive evidence of a current infection. While experts say these tests will be important in the future, we have not seen widespread guidance on how these tests should be used."

* * *

> "Serology antibody tests continue to be a focus in healthcare with many changes in the past few weeks and very specific updates released by the FDA. The FDA has issued emergency use authorization (EUA) for some of these tests. However, some serology antibody tests are being marketed without EUA. … the accuracy and quality of those tests may vary greatly."

76. It announced it would offer one rapid antibody test using a test cassette from Healgen Scientific in addition to lab tests from Abbott Diagnostics, Ortho Clinical Diagnostics and Siemens Healthineers.

77. Healgen requires blood drawn from a vein, making it more difficult in the field for rapid testing. Still, government evaluators reported the Healgen test has a combined specificity – the ability to identify those without antibodies to COVID, a "true negative rate" – of 97.5 percent. Evaluators ranked the Hangzhou test as having a 100 percent "true negative rate."

78. On July 11, McKesson offered the Premier "RightSign" product, which also requires clinicians to draw blood from a vein for testing instead of obtaining blood from a finger stick.

79. Demand for antibody tests heightened as the COVID-19 virus spread, effectively shutting down the American economy. From March to the current date, the number of manufacturers offering tests increased from 25 to more than 200, though the tests themselves remained in short supply, while pressure mounted to use these tests to determine who could or could not return to work.

80. With demand came increased scrutiny on the FDA and antibody testing itself from Congress, scientific researchers and the media. Congress sought records from Premier, among others, and lambasted the FDA for its shoddy oversight. Researchers questioned the

efficacy and accuracy of numerous tests, including those manufactured by Hangzhou and sold by their American reseller Premier and McKesson.

81. Premier told potential customers it was working with the FDA to validate the test while it pushed the product. McKesson leveraged sales by wrapping the pitch in its slickly worded, and regularly updated, webpages thanking healthcare workers, offering its own "best approach" for better care and pledging to use its marketing muscle to keep critical medical supplies flowing. On March 30, 2020, McKesson told customers its top executives met with the President, Vice President and other administration officials to "underscore" the "critical role" McKesson plays in the medical supply chain and outline the ways "in which we are doing our part in the fight against the COVID-19 pandemic."

82. A month later, on April 28, 2020, McKesson sent a letter to customers explaining it would only sell serology tests that had received emergency approval from the FDA. Its announcement came as Congress questioned the FDA's oversight of test manufacturers, legislators demanded answers from Premier about the Chinese tests, researchers publicly raised questions about their validity, the FDA received complaints about the test and Premier's salesmen readied themselves for a shipment of 500,000 Chinese test kits worth at least $9 million.

83. McKesson ignored its own "best approach" to customer care by continuing to offer the non-EUA-approved Chinese tests through at least May 18.

84. On June 8 – four days after Premier received an EUA from the FDA – McKesson publicly announced it was using a new supplier, which ironically posted a lesser score on its government evaluation.

85. On June 24, 2020, Francisco Avendano, a diagnostic sales consultant at McKesson, made a sales pitch to the principal of the Relator for various COVID-19 tests, including Healgen. Avendano said the Premier test was unreliable, calling it "snake oil." His comments came just 18 days before McKesson began selling its "New Product" – RightSign.

86. The principal of the Relator repeatedly asked several McKesson representatives why the company stopped selling the Premier test kits, even when it left McKesson without an antibody testing product. They refused to provide an explanation.

87. McKesson executives repeatedly touted their company's critical role in fighting the pandemic, met with government officials leading the battle, monitored the swift changes to COVID-19 and serology testing landscape and informed their customers in regular web updates.

88. None of these electronic letters, web postings or sales efforts by either company discussed the questions surrounding the accuracy and validity of the rapid test itself, a test they continued to peddle without regard to the harm it could cause patients.

89. Premier and McKesson exploited the pandemic for profit. Though they knew or should have known these tests were inaccurate, they continued to sell them with reckless disregard to the potential consequences on the victims of the virus and taxpayers.

## COUNT I

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. §§ 3729 et seq.

90. Relator incorporates paragraphs 1 through 89 of this Complaint as through fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

91. As described in greater detail above, Defendants abused Government healthcare programs in connection with improper billing for medically unnecessary blood tests. More

specifically, Defendants routinely billed Payors for more expensive blood tests than those that were actually ordered by physicians and/or purposefully got physicians to order the more expensive blood test when a less expensive test was available.

92. Under the FCA, Defendants have violated:

i. 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

ii. 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

iii. 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.

93. Because of the false claims made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## COUNT II

### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT, CALIFORNIA GOVERNMENT CODE §§ 12651, et seq.

94. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein, including but not limited to evidence that shows Defendants violated California Business and Professions Code §650,

California Welfare and Institutions Code §14107.2, and the California Code of Regulations Title 22 §51501(a).

95. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 12651(a)(1) of the Act. Such claims caused actual damages to the State.

96. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 12651(a)(2) of the Act. Such claims caused actual damages to the State.

## COUNT III

### VIOLATIONS OF THE CONNECTICUT FALSE CLAIMS ACT FOR PUBLIC ASSISTANCE PROGRAMS CONN. GEN. STAT. § 17b-301 et seq.

97. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

98. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17b-301b(1) of the Act. Such claims caused actual damages to the State.

99. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 17b-301b(2) of the Act. Such claims caused actual damages to the State.

## COUNT IV

### VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT DEL. CODE ANN. TIT. 6, § 1201 et seq.

100. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

101. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1201(a)(1) of the Act. Such claims caused actual damages to the State.

102. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1201(a)(2) of the Act. Such claims caused actual damages to the State.

## COUNT V

## VIOLATIONS OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT D.C. CODE ANN. §§ 2-308.14 et seq.

103. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

104. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the District of Columbia in violation of Section 308.14(a)(1) of the Act. Such claims caused actual damages to the State.

105. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 308.14(a)(2) of the Act. Such claims caused actual damages to the State.

## COUNT VI

## VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT FLA. STAT. §§ 68.082(2) et seq.

106. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

107. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 68.082(2)(a) of the Act. Such claims caused actual damages to the State.

108. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 68.082(2)(a) of the Act. Such claims caused actual damages to the State.

## COUNT VII

### VIOLATIONS OF THE GEORGIA FALSE MEDICAID CLAIMS ACT GA. CODE ANN. §49-4-168.1 et seq.

109. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

110. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 49-4-168.1(a)(1) of the Act. Such claims caused actual damages to the State.

111. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 49-4-168.1(a)(2) of the Act. Such claims caused actual damages to the State.

## COUNT VIII

### VIOLATIONS OF THE HAWAII FALSE CLAIMS ACT HAW. REV. STAT. §661-21 et seq.

112. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

113. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 661-21(a)(1) of the Act. Such claims caused actual damages to the State.

114. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 661-21(a)(2) of the Act. Such claims caused actual damages to the State.

## COUNT IX

### VIOLATIONS OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT 740 ILL. COMP. STAT. ANN. §§ 175/3 et seq.

115. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

116. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 175/3(a)(1) of the Act. Such claims caused actual damages to the State.

117. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 175/3(a)(2) of the Act. Such claims caused actual damages to the State.

## COUNT X

### VIOLATIONS OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT INDIANA CODE 5-11-5.5-2 et seq.

118. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

119. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5-11-5.5-2(b)(2), of the Act. Such claims caused actual damages to the State.

120. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5-11-5.5-2(b)(8), of the Act. Such claims caused actual damages to the State.

## COUNT XI

## VIOLATIONS OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
## LA. REV. STAT. § 46:438.3 et seq.

121. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

122. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(A) of the Act. Such claims caused actual damages to the State.

123. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(B) of the Act. Such claims caused actual damages to the State.

## COUNT XII

## VIOLATIONS OF THE MARYLAND FALSE HEALTH CLAIMS ACT
## MD. CODE ANN., HEALTH-GEN §§2-602 et seq.

124. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

125. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2-602(A)(1), of the Act. Such claims caused actual damages to the State.

126. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 2-602(A)(2), of the Act. Such claims caused actual damages to the State.

## COUNT XIII

## VIOLATIONS OF THE MASSACHUSETTS FALSE CLAIMS ACT MASS. ANN. LAWS. CH. 12, §§ 5B et seq.

127. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

128. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5B(1), of the Act. Such claims caused actual damages to the State.

129. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5B(2), of the Act. Such claims caused actual damages to the State.

## COUNT XIV

## VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT MCLS §§ 400.607 et seq.

130. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

131. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 400.607(1), of the Act. Such claims caused actual damages to the State.

132. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 400.607(3), of the Act. Such claims caused actual damages to the State.

## COUNT XV

### VIOLATIONS OF THE MINNESOTA FALSE CLAIMS ACT MINN. STAT. §15C.02 et seq.

133. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

134. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 15C.02(a)(1), of the Act. Such claims caused actual damages to the State.

135. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 15C.01(a)(2), of the Act. Such claims caused actual damages to the State.

## COUNT XVI

### VIOLATIONS OF THE MONTANA FALSE CLAIMS ACT MONT. CODE ANN. 17-8-403(1) et seq.

136. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

137. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17-8-403(1)(a), of the Act. Such claims caused actual damages to the State.

138. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 17-8-403(1)(b) of the Act. Such claims caused actual damages to the State.

## COUNT XVII

### VIOLATIONS OF THE NEVADA SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT ACT NEV. REV. STAT. §§ 357.040 et seq.

139. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

140. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 357.040(1)(a), of the Act. Such claims caused actual damages to the State.

141. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 357.040(1)(b), of the Act. Such claims caused actual damages to the State.

## COUNT XVIII

### VIOLATIONS OF THE NEW HAMPSHIRE FALSE CLAIMS ACT N.H. REV. STAT. ANN. §167:61-b et seq.

142. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

143. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 167:61-b(I)(a), of the Act. Such claims caused actual damages to the State.

144. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 167:61-b(I)(b), of the Act. Such claims caused actual damages to the State.

## COUNT XIX

## VIOLATIONS OF THE NEW JERSEY FALSE CLAIMS ACT N.J. STAT. §2A:32C-3 et seq.

145. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

146. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 2A:32C-3(a), of the Act. Such claims caused actual damages to the State.

147. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 2A:32C-3(b), of the Act. Such claims caused actual damages to the State.

## COUNT XX

## VIOLATIONS OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT N.M. STAT. ANN. § 27-14-4A et seq.

148. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

149. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 27-14-A(1), of the Act. Such claims caused actual damages to the State.

150. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 27-14-4A(2), of the Act. Such claims caused actual damages to the State.

## COUNT XXI

### VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT NY CLS ST. FIN. § 189 et seq.

151. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

152. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 189(1)(a), of the Act. Such claims caused actual damages to the State.

153. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 189(1)(b), of the Act. Such claims caused actual damages to the State.

## COUNT XXII

### VIOLATIONS OF THE NORTH CAROLINA FALSE CLAIMS ACT N.C. GEN. STAT. §1-607(A) et seq.

154. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

155. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 1-607(A)(1), of the Act. Such claims caused actual damages to the State.

156. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 1-607(A)(2), of the Act. Such claims caused actual damages to the State.

## COUNT XXIII

### VIOLATIONS OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT OKLA. STAT. TIT. 63, §5053.1B et seq.

157. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

158. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5053.1B(1), of the Act. Such claims caused actual damages to the State.

159. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5053.1B(2), of the Act. Such claims caused actual damages to the State.

## COUNT XXIV

### VIOLATIONS OF THE RHODE ISLAND FALSE CLAIMS ACT R.I. GEN. LAWS §9-1.1-3 et seq.

160. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

161. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 9-1.1-3(a)(1), of the Act. Such claims caused actual damages to the State.

162. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 9-1.1-3(a)(2), of the Act. Such claims caused actual damages to the State.

## COUNT XXV

## VIOLATIONS OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT TENN. CODE ANN. §§ 71-5-182(a) et seq.

163. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

164. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 71-5-182(a)(1)(A), of the Act. Such claims caused actual damages to the State.

165. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 71-5-182(a)(1)(B), of the Act. Such claims caused actual damages to the State.

## COUNT XXVI

## VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION ACT TEX. HUM. RES. CODE ANN. §36.002 et seq.

166. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

167. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 36.002(1), of the Act. Such claims caused actual damages to the State.

168. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 36.002(4), of the Act. Such claims caused actual damages to the State.

## COUNT XXVII

### VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT VA. CODE §§ 8.01-216.3A et seq.

169. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

170. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 8.01-216.3A(1), of the Act. Such claims caused actual damages to the State.

171. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 8.01-216.3A(2), of the Act. Such claims caused actual damages to the State.

## COUNT XXVIII

### VIOLATIONS OF THE WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT WIS. STAT. §20.931(2) et seq.[1]

[1] The Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§ 20.931, *et seq.* was repealed effective July 15, 2015. Relator seeks only damages resulting from Defendants' conduct prior to that date.

172. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

173. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 20.931(2)(a), of the Act. Such claims caused actual damages to the State.

174. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 20.931(2)(b), of the Act. Such claims caused actual damages to the State.

## COUNT XXIX

## VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT
## Colorado Stat. §§25.5-4-304 - 25.5-4-310

175. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

176. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section §§25.5-4-304 - 25.5-4-310 of the Act. Such claims caused actual damages to the State.

177. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section §§25.5-4-304 - 25.5-4-310 of the Act. Such claims caused actual damages to the State.

## COUNT XXX

## VIOLATIONS OF THE ALASKA MEDICAL ASSISTANCE FALSE CLAIMS REPORTING ACT
## AK Stat § 09.58.010 et seq.

178. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

179. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Sec. 09.58.010(a)(1) of the Act. Such claims caused actual damages to the State.

180. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Sec. 09.58.010(a)(2) of the Act. Such claims caused actual damages to the State.

## COUNT XXX1

## VIOLATIONS OF THE CALIFORNIA INSURANCE FRAUD PREVENTION ACT Ins. Code §§ 1871 et seq.

181. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

182. Through these acts, Defendants knowingly submitted false claims for payment to private insurance companies throughout California in violation of Ins. Code § 1871.7(b). Such claims have damaged private insurance companies throughout the State of California.

## PRAYER

WHEREFORE, Relator, on behalf of the United States, respectfully requests that:

a. This Court enter an order determining that Defendants violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

b. This Court enter an order requiring Defendants to pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

c. This Court enter an order requiring Defendants to cease and desist from violating the FCA;

d. This Court enter an order requiring Defendant to pay all expenses, attorney's fees and costs associated with this action;

e. This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

f. Any and all other relief as this Court determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Dated: November 23, 2020.

Respectfully submitted,

*s/ Jesse Hoyer*
Jesse L. Hoyer
Florida Bar No.: 076934
jesse@hoyerlawgroup.com
Sean Estes
Florida Bar No.: 048320
sean@hoyerlawgroup.com
Hoyer Law Group, PLLC
2801 W. Busch Blvd., Suite 200
Tampa, Florida 33618
Tel.: (813) 375-3700
Fax: (813) 375-3710

**Lead Counsel for Relator**